### MANZEL v. HOUDE ENGINEERING CORPORATION et al.

### No. 1902.

District Court, W. D. New York.

Aug. 23, 1938.

Bean, Brooks, Buckley & Bean, of Buffalo, N. Y. (Edwin T. Bean and Richard W. Treverton, both of Buffalo, N. Y., of counsel), for plaintiff.

Carlton Hill and Charles W. Hills, Jr., both of Chicago, Ill., and I. Joseph Farley, of Detroit, Mich. (Harold I. Popp, of Buffalo, N. Y., of counsel), for defendants.

KNIGHT, District Judge.

This is a patent infringement suit involving Claims 20 and 24 of Letters Patent No. 1,675,760 issued to Charles W. Manzel on July 3, 1928, covering an improvement in hydraulic shock absorbers. Title in the plaintiff is admitted. It is also admitted that the accused shock absorbers were manufactured by defendant, Houde Engineering Corporation, sold by that corporation to the Ford Motor Company, and thereafter sold by the defendant last named.

We are concerned in this suit with shock absorbers as used on automobiles. It is well known that the function of the shock

absorber is to check the rebound movement of the vehicle spring after it has been compressed by the wheels passing over an obstruction and retard the relative movement on the rebound stroke or downward movement of the spring. These checking movements have been brought about by two general types of shock absorbers: mechanical friction and hydraulic. The friction type is shown in what has been familiarly known as "snubbers"—embracing a friction strap wound around a brake drum carried by the body with the strap connected with the vehicle axle and maintained taut. That type is not now involved. In the so-called hydraulic type the movement is controlled or retarded by resistance to the flow of a viscous fluid through a relatively small passage. This flow is induced by the movement of a piston or rotor in a fluid filled chamber or cylinder. The piston or rotor is connected for movement with the vehicle axle and the cylinder or chamber with the vehicle body.

Concededly hydraulic shock absorbers are not of recent origin and various types antedate the patent in suit. As pointed out by the plaintiff, the first patent was No. 845,088 issued to Hotchkin, February 26, 1907. As revealed by the prior art patents, there has been a gradual step by step development of shock absorbers since that time. The general principles of construction of the devices in suit have long been known. Manzel embodies the general type of structure of absorbers shown in Houde Patent No. 933,070 issued September 9, 1907, and Houde No. 1,087,017 issued February 10, 1914. With the exception of the valves, the Manzel and the present Houde structures are substantially similar.

In the Manzel shock absorber, a stator member is rigidly secured to the vehicle body. The casing of the absorber rotates about the stator member counter clockwise on the bound stroke and clockwise on the rebound stroke. Two oil filled chambers are formed between the stator and rotor by the stator blade and the rotor blade. A reservoir for replenishing the supply of oil in the above-described operating chambers is found between the outside of the rotor and the cover plate of the shock absorber. On the bound stroke, oil flows from one chamber as it becomes smaller upon the movement counterclockwise of the rotor

vane, passes through a port into the reservoir and then through a ball check valve into the other chamber, which is becoming larger as the rotor vane moves. Some oil also flows through the valve into the enlarging chamber. There is a little resistance to the movement on the bound stroke because of the size of the ports through which the oil flows. On the rebound stroke the rotor moves clockwise. As the second chamber becomes smaller and the other larger as the result of this movement, the ball check valve is caused to close. The returning oil is forced to pass through the valve illustrated below:

The oil must pass between valve plug 65 and valve seat 60. Thence it passes through prescribed passages to the other chamber which is now enlarging. On the rebound stroke there is considerable resistance to the movement of rotor vane, because the passage between valve plug 65 and valve seat 60 is small. This builds up pressure in the chamber which is decreasing in size and tends to retard the movement of rotor vane and rotor. The degree of pressure and resistance depends upon the size of the opening.

Two types of Houde shock absorbers are alleged to infringe. One was put out in 1932; the other in 1934. The only difference between them is that the direction of the flow of the liquid through the valve of the absorber is reversed in the latter device. The two types show the same general flow of liquid in the chambers and the same general principle of structure of the chambers proper as in Manzel. Oil constantly fills the opposing chambers in the Manzel and Houde devices. On the bound stroke, the oil passes freely from one working chamber to the other through a ball check valved by-passage; on the rebound stroke, the by-pass ball valve automatically closes so that all oil must pass from one chamber to the other past the regulating valve plug. The rate of movement of the shock absorber rotor and the vehicle axle upon the rebound stroke depend upon the force applied upon the shock absorber and upon the position of the regulating valve plug relative to its seat.

Following are diagrammatic representations of the Houde shock absorbers:

HOUDE 1934 SHOCK ABSORBER.

A - FLOW OF FLUID THRU CHECK VALVE UNDER NON-COMPRESSION STROKE.
B - FLOW OF FLUID THRU VALVE PORTS UNDER COMPRESSION STROKE.

Two claims only are at issue. Claim 20 reads: "The combination with an hydraulic shock absorber having a passage for the discharge of fluid under pressure, of a regulating valve for controlling the discharge of fluid through said passage and including an adjustable head at one end, a valve-plug at its opposite end, and a normally neutralized yieldable element of a predetermined tension disposed between said head and said valve-plug for resisting the opening of the latter." Claim 24 is the same as Claim 20, except that it omits the requirements that the normally neutralized yieldable element shall be of a predetermined tension and that such element resists the opening of the valve plug, while it additionally provides that the yieldable element shall be disposed between the adjustable head and the valve to form a unitary structure.

The patent in suit describes an hydraulic shock absorber as an entire construction and includes various claims relative thereto. The claims in suit refer only to the regulating valve.

The Manzel patent describes a valve plug inserted in or in close proximity to a seat, a "normally neutralized" spring of predetermined tension and a screw threaded adjusting head, all making a unitary structure. "Predetermined tension" as described in the patent means the extent the spring will be compressed by pressure of a predetermined force. "Normally neutralized", as applied to a spring, means that it is normally neither under tension nor compression.

The Houde devices show what is described as thermostatic control. Its purpose is alleged to be to regulate, according to temperature, the width of opening of an orifice slit in the seat structure in which the valve plug is engaged. Houde claims that any change in the size of the arcuate slit is only to an extent caused by temperature changes. Thermostatic action is brought about by the bi-metallic material in the spring, heat causing the spring to stretch or expand, and cold causing it to withdraw or contract. Manzel does not disclose any thermostatic control.

In the Houde devices on the bound stroke, whether the oil flows first through the arcuate slit or axially over the vane of the valve plug, any pressure which may be exerted on the vane of the valve plug is negligible since the opening of the ball check valve permits free passage of the oil through the relatively larger passage of such valve. In the 1932 structure on the rebound stroke the oil is forced through the arcuate slit, as through a nozzle, against the flat vane surface of the valve plug. This causes the valve plug to move in a counter-clockwise direction, decreasing the length of the arcuate slit and increasing the resistance to the flow of oil.

This action impedes the return of the rotor to normal position, thus retarding the speed of the rebound stroke. There is no yielding of the valve to permit a greater flow of oil, as in plaintiff's device, to hasten the return of the rotor to normal position. In the 1934 device the flow through the valve was reversed and the oil required to enter the valve axially on the rebound stroke. As the oil flows over the vane and out through the arcuate slit, the tendency of the oil to build up a pressure area is offset by the fact that there is a zone of decreased pressure at the opening, since the oil is flowing out of a restricting orifice into a larger chamber. Thus, in the 1934 device, there is no opening or closing of the valve and no increase or decrease in the rate of flow of the oil, the valve opening remaining as originally adjusted, subject of course to the automatic thermostatic regulation.

The Manzel valve is a unitary structure, milled from a single piece of material. The Houde valve is the same in both the 1932 and 1934 shock absorbers. It is made up in several pieces. For use, these are fastened together into a single structure. This valve unit has a threaded head for adjustment purposes, a valve plug at the opposite end and intermediate the two, a spring which, when in place in the complete shock absorber, is under no tension although having a predetermined resistance to a turning motion of the valve plug. It will be seen from this description that, in its physical aspect, the Houde valve structure corresponds to the patent device as described in the claims in suit.

The movement of the Manzel and Houde valves differs. In Manzel, pressure is exerted against the end of the valve plug and upon impact causing rebound pressure sufficient to overcome the resistance of the yieldable element or spring, the valve plug is forced axially away from the valve seat. The degree of this movement is in proportion to the degree of pressure exerted. The

movement of the Houde valve plug is rotary. In the 1932 device upon the rebound stroke this rotary movement closes the valve to reduce the amount of oil flowing from one chamber to the other, the return of the rotor to normal or to a position for taking care of the next impact being retarded. The automatic regulation of the valve in accordance with temperature changes is accomplished through this rotary action. In the 1934 device the only rotary action results from this thermostatic control. The demonstrations before the court showed that the Manzel valve limits the increase of pressure while permitting unlimited rate of movement. In Houde the valve permits unlimited increase of pressure but only limited rate of movement.

It must be found that the valve spring in the Houde device does not resist the opening of the valve plug but resists the closing thereof in the 1932 model, while in the 1934 model it remains neutral as far as rebound pressure is concerned. It is further determined that the Houde device does not operate in the same manner as Manzel, since, instead of yielding to open under greater rebound pressure, the Houde valve either closes or remains neutral. Thus it is seen that the result obtained is dissimilar, since Manzel's valve hastens the recovery of the absorber, while the Houde valve impedes the recovery or allows a normal recovery. The devices obtain the final result of cushioning the ride of the automobile by different means and under different theories. The Houde valve, whether used with the 1932 or the 1934 shock absorber, fails to answer the requirements or purposes of Claims 20 and 24 and must be held not to infringe the patent.

The patent to Fox, No. 2,004,752, shows a valve similar to that used by Houde and claims for such valve a closing action under rebound pressure. The fact that this patent was granted after the allowance of the Manzel patent indicates that the Patent Office considered that there was a difference in principle and operation between the two types of valve. The advertising of the Ford Motor Company, to the effect that the shock absorbers provide thermostatic control as well as compensation for sudden shocks, is not inconsistent with the Houde claim that it does have shock control but effects such control in a different way from Manzel.

The fact that the plaintiff makes his valve from a single piece of material while Houde utilizes a valve consisting of several pieces fastened together does not affect the question of infringement. No invention lies in making as a single piece a structure formerly made of two or more pieces. Kirsch Mfg. Co. v. Gould Mersereau Co., 2 Cir., 6 F.2d 793; Hodderson-Balling v. Lorenz, 2 Cir., 60 F.2d 709; Howard v. Detroit Stove Works, 150 U.S. 164, 14 S.Ct. 68, 37 L.Ed. 1039.

Even though an opposite finding had been made on the question of infringement, it would be necessary to deny plaintiff the relief sought. The prior art shows structures which render the patent invalid. Anderson, No. 1,151,326, shows a valve constructed of one piece of material. The head is threaded for adjustment of the original setting of the valve. The valve plug consists of a flat piece tapered down near the valve head to make it resilient. This valve is inserted somewhat loosely in a seat between two liquid filled chambers, thus allowing some flow of liquid at all times. It is under no tension when at rest. However, in the event of a severe impact, the valve plug is pressed to one side to enlarge the opening and allow a greater flow of oil, thus securing a cushioning effect proportionate to the force of the impact. This shock absorber is double acting, the spring yielding in either direction and giving the same effect on both the bound and rebound movements. Since the Anderson spring is formed by tapering down the material between the valve head and plug, it is evident that the degree of tapering will determine the tension or resistance of the spring. The tension depends upon the thickness of the spring, and this relationship is as easily determined for a flat or leaf spring as for plaintiff's milled spring. It is apparent from the foregoing description that the Anderson valve meets all the requirements of both claims in suit, having, in a unitary structure, an adjustable head, a valve plug, and a normally neutral yieldable element disposed between the head and plug, said yieldable element having a predetermined tension for resisting the opening of the valve. The Anderson valve is similar to the valve of the patent not only as to method of operation but also as to the result obtained. While a short spring is fastened on each side of the valve head, the free ends of which abut the lower part of the

 

valve plug and assist in absorbing the shock of severe impacts, it would not seem, in view of Anderson's disclosure, that it would amount to invention to remove such auxiliary springs and strengthen the valve spring proper. Plaintiff's contention that these springs are essential to operation cannot be given much weight. Plaintiff also contends that the allowance of sufficient clearance between the valve plug and spring to allow rotation for adjustment would allow such free passage of oil as to render inadequate the resistance. This contention resolves itself to a question of degree of control. While a greater degree of control may be an improvement, such a change, in the absence of the performance of a new function, is not generally regarded as inventive.

The patent to Kirby, No. 1,515,862, discloses a device designed to operate upon the same principle followed by Houde. A valve was provided which closed in proportion to the degree of rebound pressure. While it appears from the specifications that the yieldable element is under some tension and while the Examiner finally allowed the claim on the theory that Kirby does show a tensioned spring, this difference is not sufficient to support Manzel's claim. Merely providing an untensioned spring in place of one having a slight tension in a device which in other respects is equivalent does not constitute invention. Such a change or alteration is within the skill of a mechanic skilled in the art. The fact that this requirement of a tensed spring is coupled with a resistance to the closing rather than the opening of the valve does not require a finding that the change constitutes invention.

Shultz Patent, No. 1,695,933, specifies a "spring 48 arranged between the adjusting screw and the regulating valve and operating to hold the other yieldingly against its seat * * *." In describing the operation of the valve, the specifications state that the movement of the piston "is retarded * * * until the resistance of the regulating spring 48 is overcome * *" and that the cushioning effect "gradually increases in proportion to the force of the shock * * . *." There is no statement as to the degree of tension of the Shultz spring. As previously stated in regard to Kirby, the substitution of an untensioned spring for one with a slight tension is not inventive. The result obtained and the manner of obtaining it are so similar that no material distinction should be made.

The complaint is dismissed.

Findings of Fact and Conclusions of Law in accordance with this opinion may be submitted.